IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| DIRTT ENVIRONMENTAL SOLUTIONS, INC. | § § § | |
| *Plaintiff,* | § § | |
| v. | § § | CIVIL ACTION NO.  3:21-cv-1483 |
| FALKBUILT, INC. and FALKBUILT LTD., | § § § | JURY TRIAL DEMANDED |
| *Defendants.* | § § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff DIRTT Environmental Solutions, Inc. ("Plaintiff" or "DIRTT"), by and through

its attorneys, AKERMAN LLP, files this Original Complaint against Defendants Falkbuilt, Inc. and

Falkbuilt Ltd. (collectively "Defendants", "Falkbuilt", or the "Falkbuilt Entities"), and alleges as

follows:

## NATURE OF ACTION

The Falkbuilt Entities have unlawfully used DIRTT confidential information and have

intentionally sown confusion in the United States in an attempt to steal customers, opportunities,

and business intelligence, with the aim of setting up a competing business in the United States

market.  Among other matters:  (1) ex-DIRTT employee and current Falkbuilt employee Lance

Henderson uploaded over 35 gigabytes of DIRTT data, which included confidential and

proprietary information, to a personal cloud-based data storage location[1]; (2) immediately after

her departure from DIRTT, Amanda Buczynski, also a former DIRTT employee, reached out to

---

[1] DIRTT is seeking redress from Mr. Henderson in the United States District Court for the
District of Utah, *DIRTT Env'tl Solutions, Inc. v. Henderson*, Case No. 19-cv-00144.

DIRTT customers on behalf of Falkbuilt in an effort to compete on ongoing U.S. projects and undercut DIRTT's bids by utilizing DIRTT confidential information; (3) upon information and belief, multiple other former DIRTT employees or former employees of DIRTT's parent, all of whom had access to DIRTT's significant confidential and proprietary information and trade secrets pertaining to DIRTT's business ("DIRTT Confidential Business Information"), took steps to access and acquire such information to aid the Falkbuilt Entities' competition with DIRTT in the United States market by disclosing such information within the United States market; (4) the Falkbuilt Entities misleadingly market their products in the United States as having identical or superior characteristics to DIRTT products even though the products are neither similar nor identical in significant part and are inferior for the purposes of the market; and (5) the Falkbuilt Entities continue to trade on an alleged connection with DIRTT products and technology in the United States, while publicly degrading DIRTT's brand and reputation.

## THE PARTIES

1.      Plaintiff DIRTT Environmental Solutions, Inc. ("DIRTT") is a Colorado company, with its principal places of business in the United States located in Savannah, Georgia and Phoenix, Arizona. DIRTT maintains an executive headquarters and showroom in Plano, Texas. DIRTT is the licensee of the trade secrets at issue in this case. While DIRTT's headquarters are located in Calgary, Alberta, Canada, DIRTT operates exclusively in the United States market.

2.      Defendant Falkbuilt, Inc. is a Delaware corporation. Falkbuilt, Inc. was established to emulate DIRTT's business model by departed DIRTT employees.

3.     Defendant Falkbuilt Ltd. is a Canadian company with its principal place of business in Calgary, Alberta, Canada. Falkbuilt Ltd. conducts the majority of its business in the United States.

4.     Falkbuilt Ltd. conducts business in the U.S. through a network of captive and independent representatives, comprised largely of former DIRTT employees and representatives, that it refers to as "Falk Branches". Many United States Falk Branches formerly operated as DIRTT Regional Partners.

5.     Falkbuilt Ltd. operates in the U.S. through 66 Falk Branches, all of which are identified under the "Contact" tab on Falkbuilt Ltd.'s website, www.falkbuilt.com: Anchorage, AK; Atlanta, GA; Austin, TX; Bakersfield, CA; Birmingham, AL; Boise, ID; Boston, MA; Buffalo, NY; Burlington, VT; Charleston, SC; Charlotte, NC; Chicago, IL; Chicago Metro (Batavia, IL); Cincinnati, OH; Cleveland, OH; Columbus, OH; Dallas, TX (Falkbuilt by Bauhaus); Dallas, TX; Denver, CO; Des Moines, IA; Detroit, MI; Fresno, CA; Ft. Lauderdale, FL; Greater Philadelphia (West Chester, PA); Greater Phoenix; Greater Seattle (Kent, WA); Green Bay (Greenville, WI); Greenville, SC; Hartford, CT; Houston, TX; Houston – Falkbuilt by Bauhaus; Huntsville, AL; Indianapolis, IN; Jacksonville, FL; Kansas City, MO; Knoxville, TN; Laguna Beach, CA; Las Vegas, NV; Los Angeles, CA; Louisville, KY; Madison (Waunakee, WI); Manchester, NH; Milwaukee, WI; Minneapolis-St. Paul, MN; Montgomery, AL; Morristown, NJ; Nashville, TN; New York, NY; Newport Beach, CA; Orlando, FL; Philadelphia, PA; Phoenix, AZ; Piedmont-Triad (Winston-Salem, NC); Pittsburgh, PA; Portland, ME; Providence, RI; Raleigh, NC; Salt Lake City, UT; San Diego, CA; Savannah, GA; Seattle, WA – Falkbuilt by Vantis Branch; Seattle, WA; St. Louis, MO; Tampa, FL; Toledo, OH; and

Tulsa, OK – Falkbuilt by Bauhaus. Upon information and belief, these branches are affiliated primarily with Falkbuilt Ltd. Sample pages from Falkbuilt Ltd.'s website are attached as Ex. A.

## BACKGROUND

6.      On December 11, 2019, DIRTT filed a lawsuit against Falkbuilt Ltd., Falkbuilt, LLC, Falk Mountain States, Lance Henderson, and Kristy Henderson in the United States District Court for the District of Utah, styled *DIRTT, Inc. v. Henderson*, Case No. 1:19-cv-00144. The suit asserted claims for violations of the Federal Defend Trade Secrets Act, the Utah Uniform Trade Secrets Act, the Pennsylvania Uniform Trade Secrets Act, and breaches of contracts (against Henderson).

7.      Falkbuilt Ltd., the Canadian defendant, conceding that jurisdiction and venue in the U.S. were proper against it, answered the complaint and filed a counterclaim on February 5, 2020.

8.      An injunction was issued on March 13, 2020, prohibiting defendants, the U.S. Falk Branches in existence at the time, and Falkbuilt, Inc. from, among other things, disclosing, relying upon, or disseminating any DIRTT information in the United States market.

9.      The parties subsequently engaged in discovery. On October 20, 2020, based on new information, an amended complaint was filed which added as a plaintiff DIRTT Environmental Solutions Ltd., a Canadian company, and defendants Mogens Smed, a Canadian individual, and Falkbuilt, Inc., a United States company.

10.     Defendants Falkbuilt Ltd., Falkbuilt, Inc., and Mogens Smed then filed a motion to dismiss based on *forum non conveniens*, arguing that Canada was a more convenient forum and that by adding two additional Canadian parties, plaintiffs had "pled themselves" out of a U.S. court. Judge David Barlow of the Utah district court granted the motion, asserting, among

other matters, that Utah did not have a close connection to the balance of the dispute. DIRTT vehemently disagrees with the ruling, and intends to appeal upon the entry of a Rule 54(b) certification. In reliance upon Judge Barlow's ruling, it has taken three specific steps. First, in this Complaint, DIRTT's Canadian parent is not a party. Second, no claims are asserted against Mr. Smed, the founder of both DIRTT Ltd. and Falkbuilt Ltd. Third, in order to minimize any possible Canadian connection, DIRTT has brought its claims that are more closely tied to Canada (claims that DIRTT still believes can and should be litigated in the United States) in Canada. DIRTT is only seeking relief in this case for wrongful acts in the United States and for United States injury and disclaims any relief for injury received, directly or indirectly, in Canada by DIRTT or its parent company or affiliates.

11.     The Utah court's dismissal was conditioned upon Falkbuilt Ltd., Falkbuilt, Inc., and Mogens Smed stipulating that they agreed to be bound by the preliminary injunction that had been entered in the Utah case, should a Canadian court enter the same injunction in Canada. These defendants so consented and filed their stipulation of consent with the Utah court.

12.     The present case before the Court does not include either DIRTT Environmental Solutions Ltd. or Mogens Smed as parties. It seeks relief based upon conduct occurring solely in the U.S., injury suffered solely in the U.S., and it only asserts claims arising under codified U.S. statutory law.

## RELEVANT BACKGROUND OF THE PARTIES

13.      DIRTT is an innovative, technology-driven company that operates solely in the United States. DIRTT's U.S. sales offices in Salt Lake City, Phoenix, New York, and Chicago are supported by its factories and distribution centers across the United States. While DIRTT's

headquarters are located in Calgary, it is a Colorado company that conducts none of its operations in Canada.

14.    DIRTT licenses its trade secrets and software from non-party DIRTT Environmental Solutions Ltd. DIRTT Environmental Solutions Ltd. does not operate in the United States.

15.    DIRTT offers products and services for the digital design of component, prefabricated construction to build out interior spaces in buildings (referred to as "interior construction"). Among many other services, DIRTT offers clients the ability to utilize virtual-reality to design office, healthcare, and other interior spaces using modular components which can be rapidly and affordably assembled in DIRTT's factories and on-site. This process provides significant savings in material, cost, and time to install the actual prefabricated building products.

16.    DIRTT is an innovator and leader in the prefabricated, interior design, and construction market space.

17.    DIRTT employs a proprietary software and virtual-reality visualization platform coupled with vertically-integrated manufacturing that designs, configures and manufactures prefabricated interior construction solutions used primarily in commercial spaces across a wide range of industries and businesses. Plaintiff combines innovative product design with its industry-leading, proprietary ICE Software ("ICE Software" or "ICE") and technology-driven, lean manufacturing practices and sustainable materials to provide an end-to-end solution for the traditionally inefficient and fragmented interior construction industry. DIRTT creates customized interiors with the aesthetics of conventional construction, but with greater cost and schedule certainty, shorter lead times, greater future flexibility, and better environmental sustainability than conventional construction.

18.    DIRTT offers interior construction solutions throughout the United States through a network of independent regional partners ("Regional Partners") and an internal sales team. Regional Partners use the ICE Software to work with end users to envision and design their spaces. Orders are electronically transmitted through ICE to DIRTT's manufacturing facilities for production, packing and shipping. DIRTT's Regional Partners then coordinate the receipt and installation of DIRTT's interior construction solutions at the end users' locations.

19.    ICE generates valuable proprietary information, including cost and margin information, the components of the bill of materials for individual companies, detailed plans and specifications for projects, and customer requirements.

20.    Apart from ICE, DIRTT's internal restricted information and communications network contains other sources of valuable information, including prospective and current customer databases that contain information on potential projects, as well as the status of all pending projects, and a restricted site for individually-approved users to access called "MyDIRTT", which contains confidential technical information such as diagrams and other technical know-how.

21.    DIRTT's Regional Partners execute confidentiality agreements and have access to confidential information, including pricing and prospective customers.

22.    In addition to sales and marketing, Regional Partners provide value throughout the planning, design and installation/construction process. At the pre-construction stage, Regional Partners provide design assistance services to architects, designers and end clients. Through the installation/construction process, Regional Partners act as specialty subcontractors to the general contractors and provide installation and other construction services. Post move-in, Regional Partners provide warranty work, ongoing maintenance and repurposing support. The

Regional Partners operate under Regional Partner agreements with DIRTT, which outline sales goals and marketing territories and provide the terms and conditions upon which the Regional Partners market and sell DIRTT products. Regional Partners agree in writing to keep information generated through this process confidential.

23.     DIRTT also operates several "DIRTT Experience Centers" ("DXCs") (previously referred to as "Green Learning Centers"), which are display areas used to showcase DIRTT's products and services. Plaintiff generally requires its Regional Partners to construct and maintain a DXC in their local markets. DIRTT's newest Experience Center is located in the Dallas/Fort Worth area.

24.     DIRTT conducts its U.S. business in a number of cities, including Dallas, Texas; Salt Lake City, Utah; Chicago, Illinois; New York, New York; and Phoenix, Arizona. DIRTT's U.S. executive headquarters and a DIRTT showroom are located in Plano, Texas. DIRTT operates U.S. manufacturing facilities in Phoenix, Arizona and Savannah, Georgia. In June 2021, DIRTT opened a manufacturing facility in Rock Hill, South Carolina.

25.     DIRTT conducts substantial business in Texas, with Regional Partners located in several Texas cities, including Austin, Dallas, and Houston. Key DIRTT executives, including DIRTT's CEO, General Counsel and Chief Commercial Officer reside in and work from the Dallas/Fort Worth area.

26.     Similarly, Falkbuilt conducts a considerable volume of business in Texas, as it has multiple branches across the state, and, upon information and belief, conducts substantial sales activity in the state. On June 14, 2021, Falkbuilt's CEO issued a Tweet acknowledging that Dallas, Texas is one of Falkbuilt's "most successful territories to date." *See* Ex. B.

27.     This action concerns the improper use of DIRTT's Confidential Business Information in the United States market. Additionally, this action addresses false and misleading statements by Falkbuilt representatives creating confusion in the U.S. market and causing Plaintiff to suffer financial injuries measured under both federal and state law in the United States.

## JURISDICTION AND VENUE

28.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this action arises under the following federal statutes: 15 U.S.C. §1051, *et seq*. and 18 U.S.C. § 1836. This Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367, as they are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy. The Court also has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1332, as there is complete diversity and the amount in controversy exceeds the statutory minimum.

29.     This Court has personal jurisdiction over Falkbuilt, Inc. because Falkbuilt, Inc. regularly conducts business in the State of Texas, and Falkbuilt, Inc. should have reasonably anticipated being haled into a Texas court over claims based on the DIRTT Confidential Business Information it has used to compete with DIRTT in Texas.

30.     This Court has personal jurisdiction over Falkbuilt Ltd. because Falkbuilt Ltd. regularly conducts business in the State of Texas, and Falkbuilt Ltd. should have reasonably anticipated being haled into a Texas court over claims based on the DIRTT Confidential Business Information it has used to compete with DIRTT in Texas.

31.     Falkbuilt Ltd. also has multiple agents in the United States that hold themselves out as employees and agents of Falkbuilt Ltd., independently establishing jurisdiction over Falkbuilt Ltd.

32.     In addition, Falkbuilt Ltd. has availed itself of the protections of United States courts, as it has filed a counterclaim against DIRTT, Inc. and DIRTT Environmental Solutions Ltd. in an action for patent infringement pending against Falkbuilt Ltd. in the Northern District of Illinois, *DIRTT Envt'l Solutions, Ltd. v. Falkbuilt, Ltd.*, Case No. 20-cv-04637. *See* Ex. C for coverage of Falkbuilt Ltd.'s expansion of its U.S. activities. Falkbuilt Ltd. further has invested in some of its United States partners.

33.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) as a substantial portion of the events giving rise to this action occurred in this district. For example, Falkbuilt Inc. and Falkbuilt Ltd. have competed with DIRTT in bidding on numerous construction projects within this district and have used DIRTT Confidential Business Information to enable them to undercut DIRTT's pricing to submit winning bids on some of these projects. *See* Ex. D (filed under seal).

## FACTUAL BACKGROUND

34.     Since at least the fall of 2018, the Falkbuilt Entities have engaged in an ongoing attempt to replicate DIRTT's United States business, steal DIRTT's United States clients, and co-opt DIRTT's product characteristics and business reputation in the United States as Falkbuilt's own, through improper means, including but not limited to using DIRTT confidential information and trade secrets to identify and approach customers and potential customers in the United States, utilizing pricing and margin information to undercut DIRTT's quotes for projects in the United States, and sowing confusion in the U.S. marketplace by drawing false

equivalencies between Falkbuilt's and DIRTT's products and services. These approaches have been made both directly and indirectly through current and former U.S. DIRTT Regional Partners.

35.     Despite public statements to the contrary that the Falkbuilt Entities are not competitors of DIRTT, DIRTT determined, based on a forensic study of electronic information, that the Falkbuilt Entities were built upon, and are dependent on, both information and employees obtained from DIRTT. *See* Declaration of Julian Grijns, attached as Ex. E, at ¶¶ 6, 9. In fact, the Falkbuilt Entities would likely not be operating today but for the customer contact information, pricing, estimates and other DIRTT confidential information and trade secrets used in Falkbuilt businesses and by Falk Branches in the United States. Based on information obtained by DIRTT, as well as publicly available information, the Falkbuilt Entities are directly competing with DIRTT in the United States market.

36.     In order to compete with DIRTT in the United States market, the Falkbuilt Entities recruited DIRTT employees to work for the Falkbuilt Entities and, based on available forensic information, built Falkbuilt's United States business operations through the improper and unauthorized use of DIRTT Confidential Business Information. Falkbuilt personnel were aware that each of these employees had contractual, statutory, and common law obligations to maintain the confidentiality of DIRTT Confidential Business Information.[2] Despite the knowledge of these obligations, Falkbuilt leveraged the unauthorized disclosure of DIRTT's Confidential Business Information to compete with DIRTT in the United States.

37.     The Falkbuilt Entities have directly bid against DIRTT on projects in the United States using DIRTT Confidential Business Information.

---

[2] Damages stemming from these efforts are the subject of other litigation, and not claimed here.

38.     Further, while not independently wrongful, the Falkbuilt Entities have built their distribution system for Falkbuilt products in the United States around current and former DIRTT distributors. Those partners target the same customers and U.S. markets as DIRTT, and some have flipped from promoting DIRTT products to exclusively promoting Falkbuilt products.

39.     Upon information and belief, to facilitate the use of DIRTT's Confidential Business Information to give Falkbuilt a competitive advantage in the United States market, the Falkbuilt Entities not only actively recruited DIRTT employees to join Falkbuilt, including meeting with certain DIRTT employees in advance of their leaving DIRTT's employ, but also encouraging them to solicit other DIRTT employees to work for or on behalf of Falkbuilt. While such solicitation is not the subject of this litigation, this pattern of solicitation was meant to enable Falkbuilt to obtain DIRTT Confidential Business Information that Falkbuilt, along with its agents and branches, have unlawfully disclosed in the United States. Additionally, on information and belief, the Falkbuilt Entities encouraged the unlawful disclosure and use of DIRTT's confidential, competitive information to assist Falkbuilt in quickly getting up-to-speed and operational in the United States, and to undercut DIRTT's bids and estimates, with the end goal of ultimately taking DIRTT's U.S. customers and projects. It is no coincidence that the Falkbuilt Entities are bidding on the same projects as DIRTT and are contacting DIRTT's customers and prospective customers, as well as preventing DIRTT from ever learning of potential projects by using confidential information to divert business to the Falkbuilt Entities through current and former DIRTT Regional Partners in the United States.

40.     As can be seen from Falkbuilt Ltd.'s website, www.falkbuilt.com (advertising interior component construction for healthcare, commercial and office, and education), Falkbuilt Ltd. competes in the same market as DIRTT, www.dirtt.com (advertising projects in education,

healthcare, office space, residential, government, and hospitality). Additionally, Falkbuilt's webpages and designs mimic DIRTT's appearance. To date, several former DIRTT employees have joined Falkbuilt, either working for it or on its behalf.

**A.    The Falkbuilt Entities' Extensive U.S. Presence**

41.    In addition to the 66 Falk Branches identified above, Falkbuilt Ltd. is continuing to add new U.S. branches, rapidly expanding its U.S. market presence.

42.    The DIRTT Confidential Business Information that the Falkbuilt Entities misappropriated has enabled them to hit the ground running in these new U.S. markets and compete with DIRTT for projects.

43.    One locale where the Falkbuilt Entities have extensively competed with DIRTT is the State of Texas. Falkbuilt has established at least five Falk Branches in Texas, including two in Dallas.

44.    As reflected in Ex. D (filed under seal), the Falkbuilt Entities have competed with DIRTT on numerous Texas projects, including at least eight projects in the Dallas/Fort Worth area, and have won multiple projects on which they have competed with DIRTT.

**B.    The Falkbuilt Entities' Campaign of Misinformation in the United States Market**

**1.    Ms. Buczynski's Misattributions in the United States Market**

45.    Amanda Buczynski was a DIRTT employee between October 17, 2016 and September 17, 2019. She was responsible for DIRTT sales in a territory that included Western Pennsylvania and West Virginia. She maintained an office on site at a DIRTT Regional Partner's facility in Pittsburgh, Pennsylvania.

46.    Immediately after her departure from DIRTT, Ms. Buczynski began working for Falkbuilt Ltd., where she is a Director of Design and Construction.

47. On behalf of Falkbuilt, Ms. Buczynski walked at least one potential customer through the showroom of one of DIRTT's Regional Partners in Ohio and misrepresented to this potential customer that the DIRTT installations in the showroom were created by Falkbuilt, not DIRTT. The DIRTT installations in the showroom consisted of ready-for-market examples of DIRTT's products, used to allow DIRTT's customers to place custom orders.

48. Ms. Buczynski has also referred to Falkbuilt as "the new DIRTT" or "DIRTT 2.0" in communications with potential customers, further clouding the issue of which entity originated DIRTT's products and services, and contradicting the Falkbuilt Entities' public representations that the Falkbuilt Entities are not competing with DIRTT or building upon DIRTT technology and information.

49. Ms. Buczynski knew that these statements were false when she made them, and she made them with the intent to deceive potential DIRTT customers into believing that DIRTT's products are actually those of Falkbuilt for the purpose of steering those customers away from DIRTT to Falkbuilt.

**2.      The Falkbuilt Entities' Misdesignation and Misdescription of the Origin of Their Products and Services in the United States Market**

50. Falkbuilt's products and services are demonstrably not equivalent to DIRTT's, yet the Falkbuilt Entities continue to intentionally sow confusion in the U.S. market to leverage DIRTT's products, services, and reputation as their own.

51. The Falkbuilt Entities are also mimicking DIRTT's designs and diagrams in their promotional materials used in the U.S., misdesignating the origin in Falkbuilt Ltd.'s techsheets and brochures as Falkbuilt. DIRTT's designs and diagrams are essential to DIRTT's business in that they allow DIRTT's U.S. customers to place custom orders. Falkbuilt Ltd. issues "techsheets" describing the technical features and performance capabilities of the various

components that it purports to offer. Falkbuilt Ltd. also issues illustrated brochures depicting the various installations that it claims to be able to construct and deliver. *See* Ex. F for examples of Falkbuilt Ltd. techsheets and brochures. These techsheets and brochures are utilized by both Falkbuilt Ltd. and Falkbuilt Inc. The diagrams and products in these techsheets and brochures are so similar to those offered by DIRTT as to be virtually indistinguishable.

52.    It took DIRTT years to develop its proprietary products and their components. The Falkbuilt Entities, on the other hand, have purportedly developed their "digital construction" process and their components seemingly overnight. Upon information and belief, the Falkbuilt Entities do not actually currently possess the capabilities they are advertising, necessitating the mimicking of DIRTT's designs and diagrams, and the misdesignation of the origin of Falkbuilt's techsheets and brochures as Falkbuilt. As alleged herein, several former DIRTT employees took DIRTT's confidential and proprietary information with them to the Falkbuilt Entities, and unlawfully used or disclosed such information in the United States, which has inevitably aided the Falkbuilt Entities' ramp-up efforts in the United States market.

53.    The similarity of the Falkbuilt Entities' promotional material to that of DIRTT is no coincidence. The Falkbuilt Entities' use of advertising and promotional materials that are virtually indistinguishable from DIRTT's materials, including the language and images used, the narrative history of Falkbuilt, and the value proposition, is a key part of their overall effort to knowingly deceive potential U.S. customers into believing that Falkbuilt's work is actually that of DIRTT.

54.    However, Falkbuilt's products do not have the same capabilities and characteristics as DIRTT products. By way of example, to DIRTT's knowledge, Falkbuilt's products do not offer tamper-evident tile functionality. Falkbuilt's products do not offer a

foldable wall system with the same functionality as the rest of the product line, instead offering a third-party stacking wall only. Falkbuilt's products do not possess a system to permit mitered tiles to meet at a corner with no end cap. Falkbuilt's tiles mount only at the verticals, and must end at a vertical post, or the tile must be extended unsupported past the vertical. If the Falkbuilt Entities want a shelf, cabinet or work surface to extend from the tiles, the location must be predetermined and holes must be cut in the tiles. The shelf or cabinet cannot be relocated horizontally without having new tiles cut and internal mounting componentry moved by a technician. DIRTT, though, possesses a horizontal mounting channel that permits any hanging component to be moved on a horizontal axis at will. In fact, the technology underlying Falkbuilt's solutions is not advanced as compared to the technology underlying DIRTT's solutions.

55.     Additionally, unlike DIRTT, which uses actual wood veneer, matching the tile veneer perfectly, the Falkbuilt Entities use vinyl-wrap "Falkskin" on their metal components to emulate woodgrain. Falkbuilt's sit-stand solutions also have visible actuator housings, while DIRTT's actuator housings are concealed under the work surface with the drive mechanisms hidden inside the wall.

56.     From a functionality standpoint, Falkbuilt products fail to offer the re-configurability of DIRTT's products. For example, DIRTT's sliding door supports allow a door to easily be moved from one point to another or changed out for another door simply by moving the support, which mounts into a horizontal mounting channel, to another location. No screw holes or other marks are left behind. Additionally, should a section of a wall require reconfiguration, such as a glass wall replacing a solid wall, that single section can be removed and replaced without disturbing adjacent wall sections. Falkbuilt's walls, which are built

sequentially, would require each section to be disassembled, beginning at the end of the wall until the section to be replaced was reached. Finally, DIRTT's capabilities allow it to place walls at virtually any angle, with no ramifications when reconfigured to another angle. No drilling or damaging tile at the intersection of the walls is required. In other words, to be the functional equivalent of DIRTT, the Falkbuilt Entities would have to offer an easily reconfigurable wall system including infinite horizontal positioning (and re-positioning) of hanging components, without compromising aesthetics. Falkbuilt's system offers none of these things.

57.     Moreover, DIRTT and the Falkbuilt Entities use different materials in their systems, which renders the Falkbuilt Entities unable to provide DIRTT's advantages. DIRTT uses aluminum in its solutions, which allows for much more flexible functionality. The aluminum extrusions used in DIRTT's solutions can be formed in virtually any shape necessary, meaning DIRTT can design any shape needed to accomplish the solution's intended functionality. Falkbuilt, on the other hand, uses steel, which is much more rigid and offers far less flexibility in shaping. Because the Falkbuilt Entities rely on steel, they cannot achieve the flexibility of design and reconfigurability that DIRTT offers in its solutions. For this reason, it is not just the Falkbuilt Entities' false claims of equivalency to DIRTT that are misleading to customers, but also their own promotional material, which touts that Falkbuilt's solutions are "easily reconfigured" and have "endless design options."

58.     Similarly, the Falkbuilt Entities do not at present possess in-house design capabilities, which is an aspect of DIRTT's solution that greatly increases customization for DIRTT's customers. Rather, the Falkbuilt Entities rely on external designers to create their solutions, making it much more difficult, if not impossible in some instances, to achieve the customizability necessary to meet the customers' desired functionality.

59.     As such, the Falkbuilt Entities' attempts to equate the characteristics of their solutions with those of DIRTT constitute a blatant effort to confuse U.S. customers and capitalize on the superior characteristics of DIRTT's solutions as compared to Falkbuilt's for the same purposes, and suggest that DIRTT and Falkbuilt are the same, or that Falkbuilt's solutions are an equivalent alternative. The fact is, Falkbuilt and DIRTT are simply not equivalents.

60.     The Falkbuilt Entities further misrepresent the size and capabilities of their United States operations, as their allegedly independent representatives claim to be Falkbuilt employees.

61.     Despite the Falkbuilt Entities' contentions that they do not compete with DIRTT, these efforts are intended to damage, and have damaged, DIRTT by luring potential U.S. customers away from DIRTT to Falkbuilt. For example, a number of existing DIRTT U.S. projects, including several in Texas, have been lost to Falkbuilt, and several have been converted to Falkbuilt projects as a result of the Falkbuilt Entities' interference. *See* Ex. D (filed under seal).  Similarly, DIRTT has lost competitive bids on projects to the Falkbuilt Entities as a result of the Falkbuilt Entities' false claims of equivalency with DIRTT. In one instance, DIRTT lost the bid for phase 2 of a project for which DIRTT had done a full solution installation for phase 1 in 2018-2019. Falkbuilt was a competitor on this bid and would not have won the bid but for its false claims of equivalency and use of DIRTT's competitive information. In another example, bid documents from the architects for a particular project for which DIRTT and Falkbuilt were both competing had to be amended to clarify that the basis of the design was Falkbuilt, not DIRTT, but noted that DIRTT was an acceptable equivalent manufacturer. This amendment came after a DIRTT representative had a detailed conversation with the architectural firm issuing the bid documents and explained exactly what Falkbuilt is vis-à-vis DIRTT – *i.e.* a competitor, wholly separate from DIRTT, and not the "new DIRTT."

62.     The Falkbuilt Entities further trade on DIRTT's technology, heritage, and reputation. The Falkbuilt Entities have created a false impression within the U.S. market that they are doing what DIRTT has done in the industry for the last several years, and intentionally attempt to market themselves as associated with, or even part of, DIRTT in order to capitalize on DIRTT's reputation, historical performance, and customer base despite Falkbuilt's inferior products. The Falkbuilt Entities use the same language, the same images, and the same value proposition as DIRTT to further this effort and to confuse customers in the U.S. marketplace.

63.     As further evidence of the Falkbuilt Entities' positioning of themselves as the same as DIRTT, upon information and belief, Falkbuilt personnel has approached U.S. clients of DIRTT to be references for Falkbuilt, based only on their past experience with DIRTT, not Falkbuilt.

64.     As a result, the U.S. marketplace is highly convoluted and confused. Customers who have a history with DIRTT are now being approached by a company or companies who employ several former DIRTT employees, sell a purportedly similar product, and tout a nearly identical value proposition and origin story.  In other words, as a result of the Falkbuilt Entities' tactics of passing themselves off as "DIRTT 2.0," many U.S. customers view the Falkbuilt Entities as having some positive association with DIRTT. Some customers have even misunderstood Falkbuilt to be either a new division of DIRTT or the same company, but with a new name.

65.     In another recent example of confusion in the U.S. market, a general contractor listed the drywall and glass specification on a contract as the "DIRTT Falkbuilt system." There can be no clearer illustration of the penetration of the Falkbuilt Entities' false equivalence efforts into the U.S. market.

**C.    Ex-DIRTT Employees' Misuse of DIRTT Confidential Business Information in the United States**

66.    Upon information and belief, former employees of DIRTT, and former employees of DIRTT's parent, have aided the Falkbuilt Entities' scheme to gain a competitive advantage against DIRTT in the U.S. market through the unlawful and unauthorized disclosure and use of DIRTT's Confidential Business Information in the United States.

67.    As one example, former DIRTT employee Amanda Buczynski stole, disclosed, and otherwise misused DIRTT Confidential Business Information on behalf of the Falkbuilt Entities in the Pittsburgh, Pennsylvania market.

68.    As part of her job responsibilities with DIRTT in its Pittsburgh market, Ms. Buczynski had access to proprietary databases of customer relationships, pricing, costing, and forecasts accessible only to herself, the CEO, and the COO of DIRTT's Regional Partner in the Pittsburgh market.

69.    Ms. Buczynski, as part of her employment with DIRTT, agreed to a confidentiality agreement which provided, among other things, that she would not "without the prior written consent of DIRTT, either during the period of [her] employment or at any time thereafter, disclose or cause to be disclosed any of the Confidential Information in any manner …" *See* Ex. G (filed under seal).

70.    Ms. Buczynski also agreed to confidentiality provisions in the DIRTT offer letter she executed on September 30, 2016.

71.    Ms. Buczynski resigned from DIRTT effective September 17, 2019, falsely stating to her colleagues that she was not leaving to work for Falkbuilt.

72.    On Ms. Buczynski's last day, she plugged a USB device with a serial number that included 4A3BCF57-0 into her DIRTT-provided laptop. She also accessed a number of files and

folders on her work computer's hard drive related to ongoing DIRTT projects. Ms. Buczynski did not possess authorization to undertake any of these acts. *See* Ex. H (filed under seal); Ex. E at ¶ 9.

73.     On August 30, 2019, prior to her departure from DIRTT, Ms. Buczynski copied over 40 files, including one identified as "PPT 'Large Clients'" to a Dropbox directory/folder. *See* Ex. I (filed under seal); Ex. E at ¶ 9.

74.     In fact, as noted above, Ms. Buczynski started working for Falkbuilt immediately following her departure from DIRTT.

75.     Immediately after leaving DIRTT's employ, Ms. Buczynski reached out to one or more U.S. DIRTT customers on behalf of Falkbuilt in an effort to compete on ongoing projects and to underbid DIRTT by utilizing DIRTT's Confidential Business Information and information obtained from DIRTT's partner. *See* Ex. J; Ex. E at ¶ 9.

76.     On information and belief, Ms. Buczynski also worked to advance Falkbuilt's interests to the detriment of DIRTT in the U.S. by either hiding or sitting on leads that she received in the time leading up to her departure, including inquiries from potential U.S. partners interested in working with DIRTT.

77.     After submitting her resignation to DIRTT, Ms. Buczynski also emailed to her personal email account DIRTT customer contact information, and DIRTT pricing and estimates. *See* Ex. J.

78.     Ms. Buczynski's conduct is part of a pattern of a larger number of former U.S. DIRTT employees solicited by the Falkbuilt Entities. *See* Ex. E at ¶ 9. These other former DIRTT employees, who presently work for or on behalf of Falkbuilt, include Christina Engelbert and Laura Shadow.

79.     Other former DIRTT, Ltd. employees also took and forwarded DIRTT Confidential Business Information prior to their departures for Falkbuilt, which the Falkbuilt Entities have used to compete with DIRTT in the U.S. market. These former employees include Clayton Smed, David Weeks and Ingrid Schoning.

80.     The information downloaded and forwarded by these individuals was disseminated by the Falkbuilt Entities in the United States and used to assist the Falkbuilt Entities in undercutting DIRTT's pricing for projects in the United States for which the Falkbuilt Entities were directly competing with DIRTT.

81.     The Falkbuilt Entities have misappropriated DIRTT Confidential Business Information, are using the DIRTT Confidential Business Information in the United States, and DIRTT has reason to believe that these actions are ongoing and widespread in the U.S. market.

82.     Plaintiff has reason to believe, based upon direct knowledge of information actually taken, the facial similarity of DIRTT and Falkbuilt products, and the direct approach of the Falkbuilt Entities to DIRTT's U.S. customers and partners with purportedly similar products, that the use of DIRTT Confidential Business Information in the United States is far more widespread than currently known.

83.     DIRTT seeks all relief available at law and in equity including, but not limited to, preliminary and permanent injunctive relief to restrain Defendants from using or disclosing DIRTT Confidential Business Information in the U.S. DIRTT requests entry of the injunction consented to by Falkbuilt, Inc. and Falkbuilt Ltd. should the Court of Queen's Bench of Alberta, Canada in *DIRTT Envt'l Solutions, Ltd. v. Falkbuilt, Ltd., et al.*, Case No. 1901-06550 issue it, to protect itself from irreparable injuries caused by Defendants' conduct and to prevent further

harm in the United States (the "Prior Injunction"). DIRTT also seeks an award of compensatory damages, exemplary damages, and attorney's fees.

**D.      DIRTT Confidential Business Information Constitutes Trade Secrets**

84.      DIRTT's manufacturing approach is built on a foundation of technology, the center of which is the proprietary ICE Software. DIRTT uses ICE Software to design, visualize, configure, price, communicate, engineer, specify, order and manage projects. The ICE Software was developed in or around 2005 as a custom interior design and construction software solution to integrate into DIRTT's offerings. The ICE Software makes manufactured, fully custom interiors both feasible and profitable while addressing challenges associated with traditional construction, including cost overruns, inconsistent quality, delays, and significant material waste. The ICE Software is used throughout the sales process, ensuring consistency across the services and products received by all of DIRTT's clients in the United States.

85.      DIRTT begins manufacturing custom DIRTT products once a file (an "ICE File") is generated and a purchase order is received. The ICE Software allows an entire project to be tracked and managed across the entire production cycle through design, sales, production, delivery and installation. The ICE File (containing a project's engineering and manufacturing data) generated during the design and specification process can be used for optimizing future reconfigurations, renovations, technology integration initiatives and changes to a client's space.

86.      The ICE Software is licensed to unrelated companies and Regional Partners of DIRTT, but only for certain limited information and only if the parties agree to be bound by a confidentiality agreement.

87.      ICE files generated by ICE Software contain proprietary costing information that would be of substantial benefit to a competitor seeking to undercut DIRTT on price. Costing is a

closely-guarded secret at DIRTT for this reason, and because of the substantial efforts utilized to generate it.

88.    In addition to the ICE Software, during their employment with DIRTT, Ms. Buczynski and other former DIRTT employees had access to DIRTT Confidential Business Information, including but not limited to:

(a)    DIRTT's job costing;

(b)    DIRTT's customer and supplier lists, and a list of prospects and projects;

(c)    DIRTT's sales figures and projections;

(d)    DIRTT's pre-use customer presentations and marketing materials;

(e)    DIRTT's marketing and sales strategies;

(f)    DIRTT's customer, supplier and Regional Partner order histories, needs, and preferences;

(g)    DIRTT's customer proposals, service agreements, contracts and purchase orders;

(h)    DIRTT's plans to expand and target new clients and markets;

(i)    design specifications and drawings of DIRTT products;

(j)    specialized methods and processes used to create custom prefabricated modular interior wall partitions, other ocular interior components and other DIRTT products;

(k)    research and development of new DIRTT products;

(l)    trade secrets and intellectual property strategy, including strategy regarding the ICE Software and ancillary programs;

(m)    strategic plans and business plans; and

(n)    library of prior projects and customer needs, impossible to replicate without access to DIRTT's confidential system.

This information comprises DIRTT Confidential Business Information.

89.     DIRTT Confidential Business Information constitutes trade secrets of DIRTT. It is vital to DIRTT's business success and enables it to compete effectively in an extremely competitive marketplace. DIRTT takes reasonable measures to protect and maintain the confidentiality of DIRTT Confidential Business Information, including the measures described above.

90.     DIRTT derives substantial economic value from maintaining the secrecy of its DIRTT Confidential Business Information, including, among other things, its pricing, its customer, prospect, and supplier information, its sales figures and projections, its marketing and sales strategies, its technical-know-how, its design specifications, and its strategic and business plans. Any of this information would be immensely valuable to a competitor, and a global theft of the information would allow a competitor an unfair advantage in bidding against DIRTT on projects. DIRTT has incurred and devoted significant costs and expenses in developing its DIRTT Confidential Business Information.

91.     DIRTT Confidential Business Information, including, among other things, pricing, its customer, prospect and supplier information, its sales figures and projections, its marketing and sales strategies, its design specifications, and strategic and business plans, is neither generally known, nor is it readily ascertainable, to the general public, to DIRTT's competitors, or to any other person or entity that could obtain value from such information.

92.     DIRTT takes reasonable measures to protect and maintain the secrecy of DIRTT Confidential Business Information, including, among other things, its pricing, its customer, prospect, and supplier information, its sales figures and projections, its marketing and sales strategies, its design specifications, and its strategic and business plans.

93.     DIRTT limits access to DIRTT Confidential Business Information and requires network passwords to access DIRTT Confidential Business Information on DIRTT's computers, confidential agreements, warranty on ICE Software, and partner confidentiality agreements. DIRTT also has policies and procedures in place governing the access to and use of DIRTT Confidential Business Information, including efforts described above to identify attempts to improperly transfer DIRTT Confidential Business Information.

**E.     The Falkbuilt Entities directly and unlawfully compete with DIRTT, Inc. in the United States Market**

94.     Despite the Falkbuilt Entities' claims to the contrary, since their formation, the Falkbuilt Entities have attempted to compete in the same market as DIRTT. The Falk Branches are investors in Falkbuilt, Ltd. and many hold themselves out as employees or principals of Falkbuilt, Ltd. The email servers utilized by these purported "independent businesses" are controlled and maintained by Falkbuilt, Ltd.

95.     The Falkbuilt Entities have demonstrated a pattern of using DIRTT's partner network in an effort to gain exposure to DIRTT's competitive information and use such information to gain a competitive advantage against DIRTT in the U.S. market.

96.     The Falkbuilt Entities have created confusion in the United States marketplace by:

(a)     Presenting Falkbuilt services to customers, including DIRTT's U.S. customers and prospects, and misrepresenting the characteristics of such products and services by stating and representing that Falkbuilt products can replace DIRTT products with the full range of customization and functionality. In fact, for one project, the U.S. customer was so misled by Falkbuilt's statements concerning the similarity between DIRTT and Falkbuilt that the project documents had to be formally amended to clarify that the design was based on Falkbuilt's solution, and

that DIRTT was an acceptable alternative as a manufacturer. This change was only made after a DIRTT representative had an in-depth conversation with the architect for the project, explaining the substantial difference between DIRTT products and Falkbuilt products.

(b)    Repeatedly and falsely claiming an affiliation with DIRTT, wrongly suggesting an affiliation, and that Falkbuilt's technology is a lawful outgrowth of DIRTT's technological heritage.

(c)    Degrading DIRTT to DIRTT's U.S. customers and partners by falsely announcing departures of DIRTT's U.S. Regional Partners, falsely representing DIRTT's ability to perform its obligations with its customers, and falsely referring to the destruction of the company by current management.

97.    DIRTT has been injured in the United States by the Falkbuilt Entities' actions. Plaintiff has an interest in the integrity of DIRTT Confidential Business Information. Plaintiff also has lost revenue and faces the risk of further lost revenue in the United States.

## COUNT I – VIOLATION OF LANHAM ACT
## (15 U.S.C. § 1051, et seq.)

98.    The allegations contained in the preceding paragraphs set forth above are incorporated as if fully set forth herein.

99.    The Lanham Act provides a private cause of action for misidentification of the origin of goods and services.

100.    Specifically, the Lanham Act provides:

**§1125 FALSE DESIGNATIONS OF ORIGIN, FALSE DESCRIPTIONS, AND DILUTION FORBIDDEN**

(a) Civil action

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities.

101.    In this case, the Falkbuilt Entities have presented themselves in the United States marketplace as providing equivalent services to DIRTT. As explained above in Paragraphs 50-65, Falkbuilt's solutions are demonstrably not equivalent to those of DIRTT. Falkbuilt's solutions lack the flexibility or customizability of DIRTT's solutions, and rely on considerably older technology.

102.    The Falkbuilt Entities violated the prohibitions of the Lanham Act in the United States market in four separate ways:

(a)    Repeatedly misrepresenting the nature and character of Falkbuilt's goods and services by drawing false comparisons between DIRTT products and Falkbuilt products, which is likely to cause confusion among U.S. consumers, as explained in Paragraphs 45-65, 96 above. Specifically, the Falkbuilt Entities have misrepresented the capability of Falkbuilt solutions. Similarly, the Falkbuilt

Entities' false comparisons to DIRTT solutions misrepresent the Falkbuilt Entities' access to DIRTT's proprietary methods, which are protected by patents. The Falkbuilt Entities further misrepresent the cost of Falkbuilt products over the life of the products. Upon information and belief, such misrepresentations are not limited to individual instances, but are widespread and ongoing. At least one specific example, as explained in Paragraph 61 above, is presently known to DIRTT in which the Falkbuilt Entities' misrepresentations as to the equivalency between DIRTT products and Falkbuilt products were such that when the reality was discovered, project documents had to be formally amended.

(b)      Repeatedly and falsely representing an association or affiliation with DIRTT through social media, which is likely to cause confusion among U.S. consumers by, for example, creating an illusion that the Falkbuilt Entities have access to DIRTT's resources and clientele, and co-opting DIRTT's reputation. This is part of an ongoing effort to persuade consumers that Falkbuilt's products and services are equivalent to DIRTT's products and services. Specifically, the Falkbuilt Entities' agents have issued numerous Tweets that either (1) falsely create the illusion of his continued association with DIRTT for U.S. consumers or; (2) detail false information about DIRTT in the United States and/or its U.S. customers. These Tweets were directed to the U.S. marketplace as a whole and are attached as Ex. K.

(c)      Ms. Buczynski, on behalf of Falkbuilt, passed off the ready-for-market products in DIRTT's showroom as those of Falkbuilt and, when discussing Falkbuilt with consumers, referred to it as "the new DIRTT" or "DIRTT 2.0."

Upon information and belief, Falkbuilt partners and employees continue to make similar misrepresentations, which are directed at consumers and at the marketplace, generally.

(d)     The Falkbuilt Entities knowingly misdesignated the origin of Falkbuilt's techsheets and brochures, as well as similar information included on Falkbuilt, Ltd.'s website, mimicking DIRTT's diagrams and products even though, as explained in Paragraphs 50-65 above, there is no real equivalence between DIRTT's and Falkbuilt's interior construction solutions. Such information and promotional materials were distributed, and continue to be distributed, widely in the marketplace to U.S. consumers.

103.    There is a high likelihood of consumer confusion as to the origin of the goods and services caused by the Falkbuilt Entities' false designations of origin in the United States market. DIRTT is harmed by the false designation of DIRTT products as those of Falkbuilt because such false attribution diverts existing and potential customers, in the health care sector and others, from DIRTT to the Falkbuilt Entities, resulting in damages to DIRTT.

104.    Upon information and belief, it is due to the Falkbuilt Entities' false descriptions that several DIRTT projects in the United States, including several projects in Texas, were obtained by the Falkbuilt Entities, either by flipping projects that had previously been awarded to DIRTT, or winning bids on projects that would otherwise have gone to DIRTT but for the Falkbuilt Entities' misrepresentations.

105.    Pursuant to the Lanham Act, DIRTT is entitled to U.S. damages in the amount of: (1) the Falkbuilt Entities' profits related to the violations; (2) damages sustained by DIRTT; (3) DIRTT's costs of the action; and (4) DIRTT's attorney's fees.

## COUNT II – ENTRY AND ENFORCEMENT OF CANADIAN INJUNCTION

106.    Pursuant to principles of comity, this Court is empowered to enforce an injunction entered by a foreign court.

107.    The Court of Queen's Bench of Alberta will soon be requested to enter a preliminary injunction against Falkbuilt, Ltd., Falkbuilt, Inc. and multiple Falk Branches.

108.    Falkbuilt, Ltd. and Falkbuilt, Inc. have agreed to be bound by a preliminary injunction entered by Court of Queen's Bench of Alberta, and filed their consent with the United States District Court for the District of Utah. *See* Ex. L.

109.    If the preliminary injunction is issued by the Canadian court, DIRTT respectfully requests that the Court enforce the injunction in the United States and bind Falkbuilt Ltd., Falkbuilt, Inc. and the Falk Branches identified in the injunction to the terms of the injunction.

110.    Defendants have no legal basis to oppose entry of this injunction.

## COUNT III - VIOLATION OF TEXAS UNIFORM TRADE SECRETS ACT

111.    The allegations contained in the preceding paragraphs set forth above are incorporated as if fully set forth herein.

112.    The Texas Uniform Trade Secrets Act ("TUTSA") provides a private right of action for misappropriation of trade secrets. Tex. Civ. Prac. and Rem. Code § 134A.001 *et seq*.

113.    A "trade secret" is defined as all forms and types of information, including business, scientific, technical, economic, or engineering information, and any formula, design, prototype, pattern, plan, compilation, program device, program, code, device, method, technique, process, procedure, financial data, or list of actual or potential customers or suppliers, whether tangible or intangible and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if:

(A)   the owner of the trade secret has taken reasonable measures under the circumstances to keep the information secret; and

(B)   the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

Tex. Civ. Prac. and Rem. Code § 134A.002(6).

114.    The term "misappropriation" includes "(a) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (b) disclosure or use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; or (ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was: (A) derived from or through a person who had utilized improper means to acquire it; (B) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or (C) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (iii) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake." Tex. Civ. Prac. and Rem. Code § 134A.002(3).

115.    The term "improper means" includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." Tex. Civ. Prac. and Rem. Code § 134A.002(2).

116.    The Falkbuilt Entities have competed against DIRTT for projects in Texas on numerous occasions. The Falkbuilt Entities have used DIRTT's trade secrets, which they know

were improperly taken in violation of strict confidentiality agreements, and disseminated these trade secrets to their agents within the State of Texas, to aid their efforts to undercut DIRTT's pricing and give them an unfair advantage in bidding for projects against DIRTT in the State of Texas.

117.    The Falkbuilt Entities' violations of the TUTSA caused DIRTT substantial damage. Among other things, DIRTT was required to hire attorneys and computer forensic experts to investigate and attempt to mitigate Defendants' misappropriation of DIRTT's trade secrets and discover the extent to which the Falkbuilt Entities have, or will be able to, use or disclose DIRTT's trade secrets in Texas.

118.    DIRTT also suffered damage as a result of the loss or diminishment of value of DIRTT Confidential Business Information and other confidential and proprietary information, and diminishment of business value and competitive standing in the United States generally, and in Texas specifically.

119.    The Falkbuilt Entities compete directly with DIRTT in the United States, and Defendants continue to use the misappropriated DIRTT trade secrets to gain an unfair competitive advantage in the United States marketplace. Upon information and belief, it is at least in part due to the Falkbuilt Entities' illegal use of DIRTT's trade secrets that several DIRTT projects were stolen by the Falkbuilt Entities, and the reason why DIRTT lost bids to the Falkbuilt Entities on the same projects. A list of such projects currently known to DIRTT is attached as Ex. D (filed under seal). The Falkbuilt Entities are each liable for violations of the TUTSA because they used DIRTT trade secrets (which include DIRTT Confidential Business Information) without express or implied permission from DIRTT and because the Falkbuilt Entities knew or had reason to know that their ex-DIRTT employees had acquired DIRTT's trade

secrets under circumstances giving rise to a duty to maintain their secrecy or limit their use, and these employees had divulged DIRTT's trade secrets when they owed a duty to DIRTT to maintain their secrecy or limit their use.

120.    DIRTT has been and continues to be irreparably injured in the State of Texas by these Defendants' misappropriations of its trade secrets. Pursuant to Section 134A.004, DIRTT seeks actual and exemplary damages, as well as injunctive relief, as a result of Defendants' misappropriations.

## COUNT IV – FEDERAL DEFEND TRADE SECRETS ACT
### (18 U.S.C. § 1836)

121.    The allegations contained in the preceding paragraphs set forth above are incorporated as if fully set forth herein.

122.    The Federal Defend Trade Secrets Act provides a private right of action for an "owner of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).

123.    A "trade secret" means:

> all forms and types of financial, business, scientific, technical, economic or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically or in writing if (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1836(3).

124.    The term "misappropriation" includes the "disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use,

knew or had reason to know that the knowledge of the trade secret was . . . derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret." 18 U.S.C. § 1839(5)(B)(ii)(III).

125.   The term "improper" includes "breach of a duty to maintain secrecy …" 18 U.S.C. §1839(6).

126.   DIRTT Confidential Business Information is a "trade secret" under the Federal Defend Trade Secrets Act because it comprises confidential and proprietary customer information, including marketing plans, strategies and data, artwork, financial information, customer information, account histories and other information which DIRTT takes reasonable measures to maintain secret.

127.   Such information derives independent economic value because it provides DIRTT with a competitive commercial advantage from not being known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

128.   Upon information and belief based upon available objective information, the Falkbuilt Entities have conspired to misappropriate a large number of other DIRTT trade secrets. Plaintiff is aware of, for example, DIRTT pricing information, design documents, client specific project documents, and other trade secrets that were misappropriated. However, due to the potentially thousands of individual trade secrets at issue (i.e. individual design files, pricing documents, and client project information), DIRTT cannot reasonably identify each trade secret at issue in this Litigation until or unless the Falkbuilt Entities participate in discovery, as the information necessary for such identification is in the possession of the Falkbuilt Entities and in

the possession of those former DIRTT employees who took part in the Falkbuilt Entities' conspiracy to unlawfully use DIRTT's trade secrets in the United States.

129.    The DIRTT trade secrets misappropriated (i.e., through unlawful disclosure) by Falkbuilt Ltd. and Falkbuilt, Inc. are used in interstate commerce to bid for, design, and construct projects throughout the United States.

130.    As former DIRTT employees, those employees who have actively participated in the scheme to unlawfully compete in the United States with DIRTT by misappropriating trade secrets and confidential information, had contractual and fiduciary duties to maintain the secrecy of DIRTT's trade secrets and not misappropriate the information for their own use or for the use of DIRTT's competitors.

131.    At all relevant times, those employees were aware of the duty to maintain the secrecy of DIRTT's trade secrets and not misappropriate such information for their own use, or for the use of DIRTT's competitors.

132.    In violation of this duty, those former DIRTT employees misappropriated DIRTT's trade secrets, including, but not limited to, marketing data and analyses, customer histories and payment histories, by knowingly disclosing such information without DIRTT's express or implied consent in order to unlawfully compete with DIRTT in the United States.

133.    Defendants' violations of the Federal Defend Trade Secrets Act caused DIRTT substantial damage in the United States. Among other things, DIRTT was required to hire attorneys and computer forensic experts to investigate and attempt to mitigate Defendants' misappropriation of DIRTT's trade secrets.

134.    DIRTT also suffered damage in the United States as a result of the loss or diminishment of value of DIRTT's trade secrets, and diminishment of business value and competitive standing.

135.    The Falkbuilt Entities compete directly with DIRTT in the United States, and Defendants continue to use the misappropriated DIRTT trade secrets to gain an unfair competitive advantage in the U.S. marketplace. Upon information and belief, it is at least in part based on the Falkbuilt Entities' illegal use of DIRTT's trade secrets that several DIRTT U.S. projects were stolen by the Falkbuilt Entities, and the reason why DIRTT lost bids to the Falkbuilt Entities on the same projects.  A list of such projects currently known to DIRTT is attached as Ex. D and filed under seal.

136.    Falkbuilt, Inc. and Falkbuilt Ltd. are also directly liable for violations of the Defend Trade Secrets Act because they acquired DIRTT trade secret information through their agents, each of whom are former DIRTT employees and/or partners, knowing that such information was obtained by improper means in the United States and/or knowingly disclosed trade secrets in the United States without DIRTT's express or implied consent, including violations of those agents' explicit and implied duties of confidentiality.

137.    The Falkbuilt Entities are liable for violations of the Defend Trade Secrets Act because they used DIRTT trade secrets without express or implied permission from DIRTT, and the Falkbuilt Entities knew or had reason to know that ex-DIRTT employees had acquired the DIRTT trade secrets under circumstances giving rise to a duty to maintain their secrecy or limit their use; and had divulged DIRTT trade secrets when those employees owed a duty to DIRTT to maintain their secrecy or limit their use.

## COUNT V – VIOLATION OF PENNSYLVANIA UNIFORM
## TRADE SECRETS ACT (12 P.S. § 5302)

138.     The allegations contained in the preceding paragraphs set forth above are incorporated as if fully set forth herein.

139.     The Pennsylvania Uniform Trade Secrets Act ("PUTSA") provides a private right of action for misappropriation of trade secrets.

140.     A "trade secret" is defined as "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." 12 P.S. § 5302.

141.     The term "misappropriation" includes "(a) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (b) disclosure or use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; or (ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was: (A) derived from or through a person who had utilized improper means to acquire it; (B) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or (C) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (iii) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake." 12 P.S. § 5302.

142.    The term "improper means" includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." 12 P.S. § 5302.

143.    Ms. Buczynski, a former DIRTT employee working in Pennsylvania, had access to DIRTT's trade secrets, including DIRTT Confidential Business Information consisting of confidential customer and account information, marketing strategies and techniques, marketing and development plans for client contact information, price lists, specific contract pricing and payment histories. Such information derives economic value because it gives DIRTT a commercial competitive advantage from not being generally known to and not readily ascertainable by the public or any person who can obtain economic value from its disclosure or use.

144.    As a DIRTT employee, Ms. Buczynski was aware of the confidential nature of DIRTT's trade secrets and agreed to ensure the continued confidentiality of such information.

145.    As a DIRTT employee, Ms. Buczynski was also aware that DIRTT placed confidence in her to maintain the confidentiality of DIRTT's trade secrets.

146.    At all relevant times, DIRTT made, and continues to make, reasonable efforts to maintain the secrecy of DIRTT Confidential Business Information, by, among other things, requiring Ms. Buczynski to sign a confidentiality agreement.

147.    Upon information and belief, Defendants have conspired to misappropriate a large number of other DIRTT trade secrets. Plaintiff is aware of, for example, DIRTT pricing information, design documents, client specific project documents, and other trade secrets that were misappropriated. However, due to the potentially thousands of individual trade secrets at issue (i.e. individual design files, pricing documents, and client project information), DIRTT

cannot reasonably identify each trade secret at issue, as the information necessary for such identification is in possession of Defendants and in the possession of those former DIRTT employees who took part in Defendants' conspiracy.

148.    In violation of her duty to refrain from using or disclosing DIRTT's trade secrets, Ms. Buczynski, on her own and as part of a conspiracy with and at the direction of Falkbuilt, Inc. and Falkbuilt Ltd., misappropriated DIRTT's trade secrets. These activities of Ms. Buczynski constituted a breach of her duty to maintain the secrecy of DIRTT's trade secrets.

149.    The Falkbuilt Entities' violations of the PUTSA caused DIRTT substantial damage. Among other things, DIRTT was required to hire attorneys and computer forensic experts to investigate and attempt to mitigate the Falkbuilt Entities' misappropriation of DIRTT Confidential Business Information.

150.    DIRTT also suffered damage as a result of the loss or diminishment of value of DIRTT Confidential Business Information and other confidential and proprietary information, and diminishment of business value and competitive standing in the United States market.

151.    The Falkbuilt Entities compete directly with DIRTT in the United States, and Defendants continue to use the misappropriated DIRTT trade secrets to gain a competitive advantage in the United States marketplace. Upon information and belief, several DIRTT projects were stolen by the Falkbuilt Entities, and DIRTT lost bids to the Falkbuilt Entities on the same projects, at least in part due to the Falkbuilt Entities' illegal use of DIRTT's trade secrets. A list of such projects currently known to DIRTT is attached as Ex. D and filed under seal.

152.    DIRTT further believes that the Falkbuilt Entities are improperly using DIRTT's confidential information gained from the Falk Branches to gain a competitive edge over DIRTT

in direct competition on projects. The Falkbuilt Entities have used, and continue to use, confidential information obtained from DIRTT to undercut DIRTT's pricing on project bids for which DIRTT and the Falkbuilt Entities are in competition. In many cases, DIRTT has lost bids to the Falkbuilt Entities by mere hundreds of dollars. In one example, DIRTT lost the bid for the second phase of a project for which DIRTT had already bid, won, and completed the first phase in 2018 to 2019. DIRTT had informed its Regional Partner of the opportunity to bid on the second phase, which the partner then wrongfully disclosed to the Falkbuilt Entities.

153.   The Falkbuilt Entities are directly liable for violations of the PUTSA because they actively participated with Ms. Buczynski in misappropriating DIRTT's trade secrets.

154.   Falkbuilt, Inc. and Falkbuilt Ltd. are also directly liable for violations of the PUTSA because they acquired DIRTT trade secret information through their agent, Ms. Buczynski, knowing that such information was obtained by improper means, including violations of Ms. Buczynski's explicit and implied duties of confidentiality.

155.   Falkbuilt, Inc. and Falkbuilt Ltd. are liable for violations of the PUTSA because they used DIRTT trade secrets without express or implied permission from DIRTT, and the Falkbuilt Entities knew or had reason to know that Ms. Buczynski had acquired the DIRTT trade secrets under circumstances giving rise to a duty to maintain their secrecy or limit their use; and had divulged DIRTT's trade secrets when she owed a duty to DIRTT to maintain their secrecy or limit their use.

156.   DIRTT has been and continues to be irreparably injured by the Falkbuilt Entities' misappropriations of DIRTT's trade secrets. Pursuant to Sections 5303 and 5304 of the Act, DIRTT seeks injunctive relief, as well as monetary and exemplary damages.

## COUNT VI – VIOLATION OF COLORADO CONSUMER
## PROTECTION ACT (Colo. Rev. Stat. § 6-1-101, et seq.)

157.    The allegations contained in the preceding paragraphs set forth above are incorporated as if fully set forth herein.

158.    The Colorado Consumer Protection Act ("CCPA") provides a private cause of action to citizens of Colorado, including businesses such as DIRTT which are incorporated there.

159.    Defendants Falkbuilt, Inc. and Falkbuilt Ltd. are liable for violating the CCPA because they engaged in unfair or deceptive trade practices by:

(a)    Repeatedly misrepresenting the nature and character of Falkbuilt's goods and services by drawing false comparisons between DIRTT products and Falkbuilt products, which is likely to cause confusion among U.S. and Colorado consumers, as explained in Paragraphs 50-65 above. Specifically, the Falkbuilt Entities have misrepresented the capability of Falkbuilt's interior construction solutions. Similarly, the Falkbuilt Entities' false comparisons to DIRTT solutions misrepresent Falkbuilt's access to DIRTT's proprietary methods, which are protected by patents. The Falkbuilt Entities further misrepresent the cost of their products over the life of the products. Upon information and belief, such misrepresentations are not limited to individual instances, but are widespread and ongoing. At least one specific example, as explained in Paragraph 61 above, is presently known to DIRTT in which the Falkbuilt Entities' misrepresentations as to the equivalency between DIRTT products and Falkbuilt products was such that when the reality was discovered, project documents had to be formally amended. And DIRTT believes that it lost the bid for that project in January 2020 based on the Falkbuilt Entities' misrepresentations.

(b)     Repeatedly and falsely representing an association or affiliation with DIRTT through social media, which is likely to cause confusion among consumers by, for example, creating an illusion that the Falkbuilt Entities have access to DIRTT's resources and clientele, and co-opting DIRTT's reputation. This is part of an ongoing effort to persuade consumers that Falkbuilt's products and services are equivalent to DIRTT's products and services. Specifically, Falkbuilt's agents have issued numerous Tweets that either: (1) falsely create the illusion of his continued association with DIRTT for U.S. consumers or; (2) detail false information about DIRTT in the United States and/or its U.S. customers. These Tweets were directed to the U.S. marketplace as a whole, and are attached as Ex. K.

(c)     Ms. Buczynski, on behalf of Falkbuilt, passed off the ready-for-market products in DIRTT's showroom as those of Falkbuilt and, when discussing Falkbuilt with consumers, referred to it as "the new DIRTT" or "DIRTT 2.0". Upon information and belief, Falk Branches and employees continue to make similar misrepresentations, which are directed at consumers and at the marketplace, generally. In fact, Falkbuilt's own promotional material touts the fact that it has no showrooms, which may explain why Falk Branches and employees rely on DIRTT's showrooms to provide Falkbuilt customers with in-person demonstrations – passing off DIRTT solutions as their own.

(d)     The Falkbuilt Entities knowingly misdesignated the origin of Falkbuilt's techsheets and brochures, and similar information included on Falkbuilt, Ltd.'s website, mimicking DIRTT's diagrams and products even though, as explained in

Paragraphs 50-65 above, there is no real equivalence between DIRTT's and Falkbuilt's interior construction solutions. Such information and promotional materials were distributed, and continue to be distributed, widely in the marketplace to U.S. consumers, including consumers in Colorado.

160.    All of these acts and false statements of facts occurred in the course of the Falkbuilt Entities' business, and these Defendants' efforts to create confusion are directed generally to the United States marketplace for DIRTT's goods and services.

161.    The Defendants' acts and false statements of facts constitute an ongoing fraud on the consumer public.

162.    These acts and false statements of facts significantly impact the public as actual or potential consumers of DIRTT's goods and services because they create a high likelihood of confusion among actual or potential consumers of those goods and services as to the origin of those goods and services.

163.    The end users of DIRTT's goods and services, including U.S. hospitals and medical clinics, are not necessarily knowledgeable about the technological nuances of the process by which these units are constructed. Thus, the Defendants' efforts to misstate the origin of these goods and services have the capacity, and are highly likely, to deceive consumers. These U.S. consumers are likely to have to expend time and effort to determine the actual origin of the goods and services. Unless restrained and enjoined by this Court, the Defendants' actions will continue to cause confusion in the U.S. marketplace as to the origin of DIRTT's goods and services.

164.    Defendants' conduct has caused, and unless restrained and enjoined by this Court, will continue to cause, irreparable damage to DIRTT, a Colorado corporation, by confusing

consumers as to the origin of its goods and services and by creating doubt about DIRTT's stability with respect to its partner network. Defendants' deceptive conduct has directly and negatively impacted DIRTT's reputation, business value, and competitive standing. Upon information and belief, it is as a result of Defendants' false statements of fact that several DIRTT projects were stolen by the Falkbuilt Entities, and the reason why DIRTT lost bids to the Falkbuilt Entities on the same projects. A list of such projects currently known to DIRTT is attached as Ex. D and filed under seal.

165.    Pursuant to Colo. Rev. Stat. § 6-1-113, DIRTT is entitled to recover an amount equal to three times its actual damages, and reasonable attorneys' fees.

## <u>COUNT VII – VIOLATION OF OHIO DECEPTIVE PRACTICES ACT</u><br><u>(Ohio Rev. Code Ann. § 4165.01, et seq.)</u>

166.    The allegations contained in the preceding paragraphs set forth above are incorporated as if fully set forth herein.

167.    The Ohio Deceptive Practices Act ("ODPA") provides a private cause of action when, among other things, "in the course of [a] person's business, vocation or occupation, the person causes likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services."  Ohio Rev. Code Ann. § 4165.02(A)(2).

168.    Falkbuilt, Inc. and Falkbuilt Ltd. are liable for violations of the ODPA because they knowingly engaged in deceptive trade practices by falsely designating the source of goods and services originated by DIRTT by:

> (a)    Repeatedly misrepresenting the nature and character of the goods and services by drawing false comparisons between DIRTT products and Falkbuilt products, which is likely to cause confusion among U.S. consumers, including consumers in Ohio, as explained in Paragraphs 50-65 above. Specifically, the

Falkbuilt Entities have misrepresented the capability of Falkbuilt's interior construction solutions. Similarly, the Falkbuilt Entities' false comparisons to DIRTT solutions misrepresent Falkbuilt's access to DIRTT's proprietary methods, which are protected by patents. The Falkbuilt Entities further misrepresent the cost of Falkbuilt products over the life of the products. Upon information and belief, such misrepresentations are not limited to individual instances, but are widespread and ongoing. At least one specific example, as explained in Paragraph 61 above, is presently known to DIRTT in which the Falkbuilt Entities' misrepresentations as to the equivalency between DIRTT products and Falkbuilt products was such that when the reality was discovered, project documents had to be formally amended. And DIRTT believes that it lost the bid for that project in January 2020 due to the Falkbuilt Entities' misrepresentations.

(b)      Repeatedly and falsely representing an association or affiliation with DIRTT through social media, which is likely to cause confusion among consumers by, for example, creating an illusion that the Falkbuilt Entities have access to DIRTT's resources and clientele, and co-opting DIRTT's reputation. This is part of an ongoing effort to persuade consumers that Falkbuilt's products and services are equivalent to DIRTT's products and services. Specifically, Falkbuilt's agents have issued numerous Tweets that either: (1) falsely create the illusion of his continued association with DIRTT for U.S. consumers or; (2) detail false information about DIRTT in the United States and/or its U.S. customers.

These Tweets were directed to the U.S. marketplace as a whole, including to consumers in Ohio, and are attached hereto as Ex. K.

(c)      Ms. Buczynski, on behalf of Falkbuilt, passed off the ready-for-market products in DIRTT's showroom as those of Falkbuilt and, when discussing Falkbuilt with consumers, referred to it as "the new DIRTT" or "DIRTT 2.0". Upon information and belief, Falk Branches and employees continue to make similar misrepresentations, which are directed at U.S. consumers and at the U.S. marketplace generally. In fact, Falkbuilt's own promotional material touts the fact that it has no showrooms, which may explain why Falkbuilt partners and employees rely on DIRTT's showrooms to provide Falkbuilt customers with in-person demonstrations, passing off DIRTT's solutions as their own.

(d)      The Falkbuilt Entities knowingly misdesignated the origin of Falkbuilt's techsheets and brochures, and similar information included on Falkbuilt's website, mimicking DIRTT's diagrams and products even though, as explained in Paragraphs 50-65 above, there is no real equivalence between DIRTT's and Falkbuilt's interior construction solutions. Such information and promotional materials were distributed, and continue to be distributed, widely in the marketplace to U.S. consumers, including consumers in Ohio.

169.    There is a high likelihood of confusion or misunderstanding on the part of the buying public as to the source of DIRTT's goods and services caused by the Defendants' false designations of origin. The Defendants knew that their actions were deceptive. DIRTT is harmed by the false designation of DIRTT products as those of Falkbuilt because such false attribution

diverts existing and potential customers, in the health care sector and others, from DIRTT to Falkbuilt, resulting in monetary damages to DIRTT.

170.     Defendants' intentional efforts to misstate the origin of these goods and services have the capacity, and are highly likely, to deceive U.S. consumers, including consumers in Ohio. Unless restrained and enjoined by this Court, Defendants' actions will continue to cause confusion in the United States marketplace, including Ohio, as to the origin of DIRTT's goods and services.

171.     Defendants' deceptive conduct has directly and negatively impacted DIRTT's reputation, business value, and competitive standing. The extent of this damage is not yet known, but will be proven at trial.

172.     Pursuant to ODPA, DIRTT is entitled to an injunction enjoining Falkbuilt, Inc. and Falkbuilt Ltd. from violating the ODPA and creating a likelihood of confusion among the buying public as to the source of DIRTT's goods and services. DIRTT is further entitled under the ODPA to recover its actual damages and, due to Defendants' willful violations of the statute, DIRTT is also entitled to recover its reasonable attorneys' fees.

## **DEMAND FOR JURY TRIAL**

173.     DIRTT demands that all issues be determined by jury.

## **PRAYER FOR RELIEF**

WHEREFORE, DIRTT respectfully requests the following relief against Defendants for injury in the United States market:

a.      Enter judgment for it and against Falkbuilt Ltd. and Falkbuilt, Inc. on Counts I, II, III, IV, V, VI, and VII for injury in the United States market;

b.      Enter the Prior Injunction according to its terms immediately;

c.      Order Defendants, and all persons and entities in active concert with any of them, to provide a full accounting as to the whereabouts of all of DIRTT's trade secrets,

DIRTT Confidential Business Information and other DIRTT property in their possession, custody, or control (including information on the personal cloud drives of Defendants' employees) to the extent any such information is located in, or has otherwise been disclosed or used in the United States;

d.    Enter judgment that Falkbuilt Ltd. and Falkbuilt, Inc. are jointly and severally liable to DIRTT for its actual damages for losses resulting from these Defendants' misappropriation of DIRTT's trade secrets in the United States, including but not limited to lost U.S. profits proximately caused by Defendants' misappropriation, or in the alternative, a reasonable royalty for Defendants' misappropriation of DIRTT's trade secrets in violation of the Texas Uniform Trade Secrets Act and/or Federal Defend Trade Secrets Act only for injury in the United States market;

e.    Enter judgment that Falkbuilt Ltd. and Falkbuilt, Inc. are jointly and severally liable to DIRTT for exemplary damages for these Defendants' willful, wanton or reckless disregard of DIRTT's rights under the Texas Uniform Trade Secrets Act and/or Federal Defend Trade Secrets Act only for injury in Texas;

f.    Enter judgment that Falkbuilt Ltd. and Falkbuilt, Inc. are jointly and severally liable to DIRTT for DIRTT's attorneys' fees for these Defendants' willful, wanton or reckless disregard of DIRTT's rights under the Texas Uniform Trade Secrets Act and/or Federal Defend Trade Secret only for injury in Texas;

g.    Enter judgment that Falkbuilt, Inc. and Falkbuilt Ltd. are liable to DIRTT for its actual damages for losses resulting from their misappropriation of DIRTT's trade secrets in the United States or use and disclosure of such trade secrets in the United States, including lost profits proximately caused by Falkbuilt, Inc.'s and Falkbuilt Ltd.'s misappropriation of DIRTT's trade secrets, or, in the alternative, a reasonable royalty for their misappropriation of DIRTT's trade secrets in violation of the Pennsylvania Uniform Trade Secrets Act;

h.    Enter judgment that Falkbuilt, Inc. and Falkbuilt Ltd. are liable to DIRTT for disgorgement of all compensation paid to Ms. Buczynski by DIRTT during and after her breaches, and disgorgement of any and all profits Falkbuilt, Inc. and Falkbuilt Ltd. earned as a result of the misappropriation of DIRTT's trade secrets in violation of the Pennsylvania Uniform Trade Secrets Act;

i.    Enter judgment that Falkbuilt, Inc. and Falkbuilt Ltd. are liable to DIRTT for exemplary damages for their willful, wanton or reckless disregard of DIRTT's rights under the Pennsylvania Uniform Trade Secrets Act;

j.    Enter judgment that Falkbuilt, Inc. and Falkbuilt Ltd. are jointly and severally liable to DIRTT for DIRTT's attorneys' fees for their willful, wanton or reckless disregard of DIRTT's rights under the Pennsylvania Uniform Trade Secrets Act;

k.    Enter judgment that Falkbuilt, Inc. and Falkbuilt Ltd. are jointly and severally liable to DIRTT for their violation of the Lanham Act in the United States market;

l.      Enter judgment that Falkbuilt, Inc. and Falkbuilt Ltd. are jointly and severally liable to DIRTT for the Falkbuilt Entities' profits related to their violation of the Lanham Act; damages sustained by DIRTT in the United States; DIRTT's costs of the action; and DIRTT's attorney's fees for their violation of the Lanham Act;

m.      Enter judgment that Falkbuilt, Inc. and Falkbuilt Ltd. are jointly and severally liable to DIRTT for three times the amount of DIRTT's actual damages for their willful, wanton or reckless disregard of DIRTT's rights under the Colorado Consumer Protection Act;

n.      Enter judgment that Falkbuilt, Inc. and Falkbuilt Ltd. are jointly and severally liable to DIRTT for DIRTT's attorney's fees for Defendants' violation of the Colorado Consumer Protection Act;

o.      Enter judgment that Falkbuilt, Inc. and Falkbuilt Ltd. are jointly and severally liable to DIRTT for DIRTT's actual damages for their violation of the Ohio Deceptive Practices Act;

p.      Enter judgment that Falkbuilt, Inc. and Falkbuilt Ltd. are jointly and severally liable to DIRTT for DIRTT's attorney's fees for their willful violation of the Ohio Deceptive Practices Act;

q.      Enter an injunction enjoining Falkbuilt, Inc. and Falkbuilt Ltd. from violating the Ohio Deceptive Practices Act and creating a likelihood of confusion among the buying public as to the source of DIRTT's goods and services; and

r.      Award such other and further relief that this Court determines to be just and proper under the circumstances.

Dated:  June 24, 2021

Respectfully submitted,


*/s/ Robert E. Weitzel*
Robert E. Weitzel
Texas Bar No. 24070823
Robert.weitzel@akerman.com
**AKERMAN LLP**
2001 Ross Avenue, Suite 3600
Dallas, Texas 75201
Telephone: 214.720.4300
Facsimile:  214.981.9339

and

Jeffrey J. Mayer
Illinois Bar No. 6194013
jeffrey.mayer@akerman.com
*Pro Hac Vice application to be filed*
Catherine Miller
Illinois Bar No. 6270278
catherine.miller@akerman.com
*Pro Hac Vice application to be filed*
**AKERMAN LLP**
71 S. Wacker Drive, 47th Floor
Chicago, Illinois 60606
Telephone:  312.634.5700
Facsimile:  312.424.1900

**ATTORNEYS FOR PLAINTIFF
DIRTT ENVIRONMENTAL
SOLUTIONS, INC.**